ORIGINAL

Franco Caraccioli
1281 9th Avenue #2905
San Diego, California 92101
832-782-3298

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FRANCO CARACCIOLI, an individual,

            Plaintiff,

v.

FACEBOOK, INC., a Delaware corporation,
and Does 1-10,

            Defendants.

Case No. CV 15 4145 NC

**COMPLAINT FOR PUNITIVE DAMAGES:**

(1)   **Defamation;**
(2)   **Libel;**
(3)   **Invasion of Privacy Upon the Solitude or Seclusion;**
(4)   **Invasion of Privacy by Public Disclosure of Private Facts;**
(5)   **Invasion of Privacy in False Light;**
(6)   **Intentional Infliction of Emotional Distress;**
(7)   **Negligent Infliction of Emotional Distress;**
(8)   **Breach of Contract;**
(9)   **Negligent Supervision and Retention; AND**
(10)  **Unfair Business Practices in Violation of Cal. Bus. & Prof. Code §§ 17000, *et seq.* through §§ 17210, *et seq.***

- 1 -
COMPLAINT FOR PUNITIVE DAMAGES

**INTRODUCTION**

Mr. Caraccioli, FRANCO CARACCIOLI (hereinafter as "Mr. Caraccioli" or "Mr. Caraccioli"), alleges as follows:

**NATURE OF THE ACTION**

1.      This is a case about one of the most powerful corporations in the world, a corporation that recklessly republished a fake personal profile account named "Franco Caracciolijerkingman" (hereinafter as "Fake Account" or "Account"), inside its online digital community (hereinafter as "Website")

2.      This Fake Account conspicuously contained sexually obscene or pornographic content regarding Mr. Caraccioli. The Mr. Caraccioli did not give consent, create, nor has any knowledge of the person or entity that originally created the fake account.

3.      The Defendant entertained [see Exhibit 1] the notifications because the Defendant emailed Mr. Caraccioli admitting that after reviewing "Franco Caracciolijerkingman," the content inside the account ". . . follows the Facebook Community Standards."

4.      After entertaining and reviewing the Fake Account's conspicuous sexually obscene content, the Defendant republished the Fake Account's content by continuing to display the Account online and over the Defendant's Website for children and the entire world to see.

5.      Reviewing blatantly obvious sexually obscene material and concluding that it is not sexually obscene and not in violation of the Defendant's own "Terms of Service," when in fact it obviously is, constitutes actionable conduct that is grossly negligent, conscious, or with reckless disregard towards the truth or falsity of the Fake Account personal/private rights of others. This type of behavior is commonly referred to as MALICE under federal law which awards exemplary damages even in absence of actual damages.

6.      The Defendant recklessly republished the sexually pornographic content because the Defendant continued to display the Fake Account along with its obvious sexual content in the Defendant's Website after the Defendant received and entertained several notifications from the Mr. Caraccioli and other people, notifying the Defendant to delete the Fake Account because it was

1    obscene and violating the Defendant's very own online community standards due to the sexual

2    content of the Fake Account.

3        7.      By recklessly disregarding DEFENDANT FACEBOOKS' very own corporate laws,

4    the Defendant is engaging in deceptive or fraudulent business practice and in violation of state and

5    federal law.

6        8.      After entertaining the notifications, the Defendant recklessly disregarded its own

7    corporate policies regarding online community standards because the Defendant republished or

8    continued to display the Account along with its blatantly obscene sexual content.

9        9.      Subsequently, after the Defendant sent an email to Mr. Caraccioli notifying him that

10   the Fake Account along with its pornographic content would continue in the Website, Mr. Caraccioli

11   emailed the corporation to notify them of their reckless disregard as to the content of the

12   republication and that legal action would follow, which caused the corporation to delete the Account

13   within a day thereafter.

14   **THE PARTIES**

15       10.     Mr. Caraccioli is an individual, currently in his third year at the Thomas Jefferson

16   School of Law, residing in the County of San Diego, California.

17       11.     Defendant is a corporation registered in the California Secretary of State as

18   FACEBOOK, INC., and DOES 1 through 10 (hereinafter as "DEFENDANT FACEBOOK," or

19   "Corporation," or "Facebook") are located in their with its primary place of business at 1601 S.

20   California Ave. Palo Alto, CA 94304.

21       12.     DEFENDANT FACEBOOK is incorporated under the laws of Delaware.

22       13.     DEFENDANT FACEBOOK is a multi-billion dollar corporation that is publicly

23   traded in the New York Stock Exchange under the ticker "FB".

24       14.     The DEFENDANT FACEBOOK provides a social networking Website that connects

25   people with their friends, families, and other online communities.

26       15.     The true names and capacities, whether individual, corporate, associate, or otherwise

27   of the Defendants named herein as DOES 1 through 10, are unknown to Mr. Caraccioli at this time.

28   Mr. Caraccioli therefore sues said Defendants by such fictitious names pursuant to § 474 of the

1   California Code of Civil Procedure.  Mr. Caraccioli will seek leave to amend this Complaint to

2   allege the true names and capacities of DOES 1 through 10 when their names are ascertained.

3        16.     Mr. Caraccioli is informed and believes, and based thereon alleges, that each of the

4   DOE Defendants is in some manner liable to Mr. Caraccioli for the events and actions alleged

5   herein.  All named Defendants, and DOES 1 through 10, will be collectively referred to as

6   "Defendants."

7        17.     Mr. Caraccioli is informed and believes and thereon alleges that at all times herein

8   mentioned each of the Defendants was the agent or employee of Facebook Inc., in doing the things

9   hereinafter alleged, and was acting within the course and scope of such agency and employment.

10  Mr. Caraccioli is further informed and believes, and thereon alleges, that each of the Defendants

11  herein gave consent to, ratified, approved, and authorized the acts alleged herein to each of the

12  remaining Defendants.

13       18.     Mr. Caraccioli is informed and believes, and based thereon alleges, that each of the

14  DOE Defendants is in some manner liable to Mr. Caraccioli for the events and actions alleged

15  herein.  All named Defendants, and DOES 1 through 10, will be collectively referred to as

16  "Defendants" or "DEFENDANT FACEBOOK."

17       19.     Mr. Caraccioli is informed and believes, and based thereon alleges, that each of the

18  DOE Defendants is in some manner liable to Mr. Caraccioli for the events and actions alleged

19  herein.  All named Defendants, and DOES 1 through 10, will be collectively referred to as

20  "Defendants."

21       20.     Mr. Caraccioli is informed and believes and thereon alleges that at all times herein

22  mentioned each of the Defendants was the agent or employee of Facebook, in doing the things

23  hereinafter alleged, and was acting within the course and scope of such agency and employment.

24  Mr. Caraccioli is further informed and believes, and thereon alleges, that each of the Defendants

25  herein gave consent to, ratified, approved, and authorized the acts alleged herein to each of the

26  remaining Defendants.

27       21.     Mr. Caraccioli is informed and believes, and based thereon alleges, that at all times,

28  DEFENDANT FACEBOOK and DOES 1 through 10 were acting as an agent for each of the other

COMPLAINT FOR PUNITIVE DAMAGES

1   Defendants and each were co-conspirators with respect to the acts and the wrongful conduct alleged

2   herein so that each is responsible for the acts of the other in connection with the conspiracy in such

3   wrongful acts in connection with the other Defendants.

4        22.    DOES 1 through 10, were at all times relevant employees, supervisors and/or

5   managers in managerial positions and were responsible for hiring or implementing policies of said

6   Defendants, and in fact, in doing the actions complained of in this Complaint, were implementing

7   and following the policies of DEFENDANT FACEBOOK.

8                  **JURISDICTION AND VENUE**

9        23.    Subject matter jurisdiction over Mr. Caracciolis' federal claims is proper under this

10  court's original jurisdiction because this case involves substantial issues of federal law involving the

11  Communications Decency Act 47 U.S.C. § 230.

12       24.    This Court also has subject matter jurisdiction over Mr. Caracciolis' related state law

13  claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

14       25.    Venue is proper in this Court because the Defendants purposefully availed

15  themselves of the privilege of doing business in California and DEFENDANT FACEBOOK has its

16  corporate headquarters and principal place of business within the Northern District of California.

17                  **GENERAL ALLEGATIONS**

18             **(Facts Common To All Causes of Actions)**

19       26.    On September 14, 2015 a third party who's identity is still unascertainable to Mr.

20  Caraccioli, created the Fake Account or personal profile hereon alleged, inside Facebook's online

21  community without Mr. Caraccioli's consent under the name "Franco Caracciolijerkingman,"

22       27.    Mr. Caraccioli became aware of the Fake Account because that same account,

23  "Franco Caracciolijerkingman," and Mr. Caraccioli a friend request.

24       28.    This Fake Account included videos and pictures of Mr. Caraccioli sexually arousing

25  or pleasuring himself without Mr. Caraccioli's consent.

26       29.    After receiving the friend request, Mr. Caraccioli reported and notified

27  DEFENDANT FACEBOOK of the Fake Account and demanded for the Fake Account to be deleted

28  because of the humiliating sexual nature of the content inside the Fake Account.

30.     Subsequently, Mr. Caraccioli saw that the Fake Account had been sent to every friend that Mr. Caraccioli has in his community, requests which several friends did in fact accept.

31.     Given that hundreds of Mr. Caraccioli's closest family members, friends, professors, employers, and acquaintances are in Mr. Caraccioli's digital community of friends, Mr. Caraccioli decided to click on several photos and videos published in the Fake Account in order to report or notify DEFENDANT FACEBOOK of the Fake Account's sexual content on more than one occasion.

32.     Mr. Caraccioli sent these notifications using his own personal account named "Franco Caraccioli" at the time of the incident and using DEFENDANT FACEBOOK'S Website.

33.     Immediately thereafter, Mr. Caraccioli received a telephone call from a very close friend, informing him of the Fake Account and told Mr. Caraccioli that he would report the Account and request DEFENDANT FACEBOOK to delete the Fake Account and its obscene conten.

34.     That phone call was shortly followed by another call, from a family member this time, notifying Mr. Caraccioli about the Fake Account and reassuring Mr. Caraccioli that she would report the Account to DEFENDANT FACEBOOK and request to DEFENDANT FACEBOOK to delete the account and its obscene content.

35.     These were a couple out of many calls, text messages, or emails, notifying Mr. Caraccioli of the Fake Account and informing him that a request had been made for DEFENDANT FACEBOOK to delete the Account.

36.     Some of these messages were done solely to humiliate, mock, ridicule, or embarrass Mr. Caraccioli and were coming from people both in the United States and from other countries.

37.     The following day, DEFENDANT FACEBOOK sent Mr. Caraccioli an email [see Exhibit 1] admitting that DEFENDANT FACEBOOK had received the previous notifications of the alleged Fake Account and claimed, "We reviewed the account and determined that Franco Caracciolijerkingman is a person who's using Facebook in a way that follows the Facebook Community Standards."

/ / /

/ / /

38.     That email sent in paragraph 37 of this Complaint from DEFENDANT FACEBOOK to Mr. Caraccioli, is an admission that DEFENDANT FACEBOOK reviewed and entertained the content in the Fake Account which was conspicuously sexual in nature, establishing prima facie evidence that DEFENDANT FACEBOOK republished the Fake Account with reckless disregard towards its content.

39.     The facts in paragraph 38 constitutes republishing the sexual content because it shows prima facie evidence that DEFENDANT FACEBOOK took affirmative steps to evaluate the content sexual content in the Fake Account and recklessly disregarded its obscenity because DEFENDANT FACEBOOK claimed that the Fake Account was satisfying its community standards, thus, sponsoring or republishing the account by continuing to display its sexual content.

40.     Taking affirmative steps to review sexually explicit pornographic videos and images and determining that the content is in accordance with or following DEFENDANT FACEBOOK'S "Terms of Service," is at best a conscious, gross negligent, intentional, willful or wonton, or RECKLESS DISREGARD towards DEFENDANT FACEBOOK'S own "Terms of service" and in violation of the legislative intent thrusting the CDA because children could and did in fact view the sexual obscene content in a place that is not protected or reserved for sexual content.

41.     Following Section 3 and Section 5 of DEFENDANT FACEBOOK's "Terms of Service," DEFENDANT FACEBOOK's admission that the Fake Account "Franco Caracciolijerkingman" is following Facebook Community Standards is a *per se* violation of DEFENDANT FACEBOOK's own "Terms of Service" because those sections explicitly forbid publication of obscene nature while assuring that such publications would be deleted. This admission constitutes reckless disregard because Defendant entertained the blatant sexual content in the Fake Account and sponsored or republished the sexual content by allowing the Fake Account to continue displaying the sexual content for the world and children to see.

42.     Subsequently, Mr. Caraccioli sent DEFENDANT FACEBOOK an email stating that their reckless conduct over their own policies and "Terms of Service" towards the safety and rights of others constitutes legal action and that legal such would be taken.

///

43.    The following day and after ridiculing Mr. Caraccioli, DEFENDANT FACEBOOK deleted the Fake Account and its content, but only after the damage from contemplated republication or republication which was entertained, had already occurred and affected Mr. Caraccioli's reputation by continuing to republish the Fake Account after numerous indications to not do so.

44.    Although Mr. Caraccioli did not save all of the images republished by DEFENDANT FACEBOOK in the Fake Account, however, upon discovery or from this court's request, Mr. Caraccioli can prove the conspicuous sexual content in the Fake Account through ALL of the sexual images and videos that DEFENDANT FACEBOOK republished.

**This Action Is Brought Pursuant to the Communications and Decency Act of 1996 47 U.S.C. § 230**

45.    The Communications Decency Act ( hereinafter "CDA") provides that (1) "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and (2) "[n]o cause of action may be brought and no liability may be imposed under any State or local rule that is inconsistent with this section." *See* 47 U.S.C. §§ 230(c)(1) & (e)(3); *and,* Anthony v. Yahoo Inc., 421 F. Supp. 2d 1257, 1262 (N.D. Cal. 2006).

46.    Section 230(f)(2) defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer service, including specifically a service or system that provides access to the Internet[.]"

47.    An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

48.    "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *See* Anthony v. Yahoo Inc., at 1262; *citing,* Ben Ezra, Weinstein, & Company, Inc. v. America Online Inc., 206 F.3d 980, 986 (10th Cir.2000).

49.    Following 47 U.S.C. section 230(e)(3), nothing within its section shall be construed to prevent any State from enforcing any State law that is consistent with this section.

50.     Although the legislative intent thrusting the CDA generally provides immunity for negligent republication, however, the CDA does not afford protection to conscious or reckless conduct pertaining to the truth or falsity of the published or republished content. <u>Carafano v. Metrosplash.com Inc.</u>, 339 F.3d 1119 (9th Cir. 2003).

51.     Further,  causes of action might be premised on the publication or republication of actionable content such as for fraud, negligent misrepresentation, and ordinary negligence, for false light, or even for negligent publication of advertisements that cause harm to third parties, however, what matters is not the name of the cause of action—defamation versus negligence or versus intentional infliction of emotional distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. <u>Barnes v. Yahoo!, Inc.</u>, 570 F.3d 1096, 1101-02 (9th Cir. 2009).

52.     To put it another way, courts must ask whether the duty that the Mr. Caraccioli alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker."

53.     "A publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." <u>Id</u>.

54.     A publishers conduct is actionable under the CDA when such conduct involves contemplating or entertaining publication of offensive profiles. <u>Id</u>. At 1103. Here, it is evident that DEFENDANT FACEBOOK's conduct is actionable because Facebook entertained the publication or non-publication of the offensive material in the Fake Account [See Exhibit 1] and endorsed its content by republishing or continuing to display its sexual content online with reckless disregard pertaining to its obscene content, Mr. Caraccioli's privacy rights, and the sociological or psychological repercussions of such reckless republication due to its sensible and offensive content.

### **FIRST CAUSE OF ACTION**

#### **(Defamation)**

(Against All Defendants)

/ / /

/ / /

55.   The true names of defendants DOES 1 through 10, inclusive, are unknown to Mr. Caraccioli at this time. Mr. Caraccioli sues those defendants by such fictitious names pursuant to section 474 of the Code of Civil Procedure.

56.   Mr. Caraccioli is informed and believes, and based on that information and belief alleges, that each of the defendants designated as a DOE is legally responsible for the events and happenings referred to in this complaint, and unlawfully caused the injuries and damages to Mr. Caraccioli alleged in this complaint.

57.   Mr. Caraccioli is informed and believes, and based on that information and belief alleges, that at all times mentioned in this complaint, DOES 1 through 10 were the agents and employees of their codefendants or DEFENDANT FACEBOOK, and in doing the things alleged in this complaint were acting within the course and scope of such agency and employment.

58.   "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Batzel v. Smith, 333 F.3d 1018, 1035 (9th Cir. 2003). Here there is an agency relationship between DOES 1 through 10 and DEFENDANT FACEBOOK because only DEFENDANT FACEBOOK employees should be allowed to review and determine lawful content publication.

59.   On September 14, 2015, DEFENDANT FACEBOOK intentionally or recklessly republished sexually obscene content about Mr. Caraccioli in its Website because DEFENDANT FACEBOOK entertained the Fake Account's sexual content by reviewing the Accounts content [see Exhibit 1]  and continued to republish the content by continuing to display the Fake Account along with its content. Therefore, DEFENDANT FACEBOOK endorsed or sponsored the Fake Account by republishing the content because DEFENDANT FACEBOOK admitted that its pornographic content was not in violation of its "Community Standards."

60.   The Fake Account was concerning Mr. Caraccioli because the Fake Account referred to Mr. Caraccioli by name throughout, was made of and concerning Mr. Caraccioli physically, and was so understood by those who read or saw the Fake Account under "Franco Caracciolijerkingman."

61.     The entire Fake Account was false as it pertains to Mr. Caraccioli in name, imagery, and display and diminished his reputation based on the mock and ridicule he experienced.

62.     The Fake Account was libelous on its face because it clearly exposed Mr. Caraccioli to hatred, contempt, ridicule and obloquy. Further, the Fake Account's content was pertaining the Mr. Caraccioli and involved extremely sensitive material under a reasonable person standard.

///

63.     Moreover, the republishing constitutes libel per se because of the amount of people that were exposed to Mr. Caraccioli's privacy though set forth herein.

64.     Mr. Caraccioli is informed and believes, and based thereon alleges, that on or about September 14, 2014 DEFENDANT FACEBOOK and DOES 1 through 10, conspired to republish the Fake Account.

65.     The Fake Account referenced above was false and defamatory and were made by DEFENDANT FACEBOOK with knowledge of their falsity or with reckless disregard for their truth pursuant to a conspiracy. DEFENDANT FACEBOOK referred to Mr. Caraccioli by name or innuendo and those who read or saw the Fake Account understood they concerned the Mr. Caraccioli.

66.     The Fake Account was seen and read on or about September 14, 2014 by hundreds or anyone who received a friend request or saw the Fake Account. Specific names are ascertainable and can be given upon discovery.

67.     The above-described republication was not privileged because it was published by DEFENDANT FACEBOOK with conscious or reckless disregard as to the falsity or obscene sexual content, therefore establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

68.     Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial

69.     As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

70.     Punitive damages are awarded whenever malice, gross negligent, or conscious/reckless disregard conduct as to the falsity of the statement, is found against the defendant on the underlying claims, regardless of whether actual damages are neither found nor shown. New York Times Co. v. Sullivan, 376 U.S. 254, 262 (1964).

71.     DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr. Caraccioli's the truth or falsity of the Fake Account because DEFENDANT FACEBOOK reviewed the obscenity of the Fake Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for republication.

72.     As a proximate result from republishing the sexual content in the Fake Account referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake Account and/or personally kept or copied the images or videos in the Account. Therefore, Mr. Caraccioli suffered and will suffer in the future, general and special damages including but not limited to, damages for psychological expenses, lost income and damage to her trade, profession, and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds this Court's jurisdictional minimum, but in no event less than $100,000.00.

73.     The aforementioned wrongful acts of Defendants were done intentionally or with a conscious/reckless disregard of Mr. Caraccioli rights, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to exemplary and punitive damages in an amount appropriate to punish or to set an example of Defendants and each of them, and to deter such conduct in the future, which amount will be proved at trial, but in no event should be less than $1,000,000.00.

74.     The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are not furthered by providing immunity in instances where posted reposted material is clearly not meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

/ / /

/ / /

COMPLAINT FOR PUNITIVE DAMAGES

## SECOND CAUSE OF ACTION

### (LIBEL PER SE)

(Against All Defendants)

75.     A libel which is defamatory of the Mr. Caraccioli without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the Mr. Caraccioli alleges and proves that he has suffered special damage as a proximate result thereof. Cal. Civ. Code Ann. § 45a.

76.     In other words, a defamatory statement about the Mr. Caraccioli that is communicated in a fixed medium and is considered to be so harmful on its face, the Mr. Caraccioli need not prove special damages. Examples of libel per se are statements that: (i) relate to the person's business or profession to the person's detriment; (ii) falsely claim that the person committed a crime of moral turpitude; (iii) imputes unchastity on the person; or (iv) claim that the person suffers from a loathsome disease.

77.     DEFENDANT FACEBOOK's conduct constitutes libel per se because Facebook republished the Fake Account that imputes unchastity upon Mr. Caraccioli and republication was over the internet, which is a fixed medium.

78.     The libelous statement was concerning Mr. Caraccioli because the Fake Account mentioned Mr. Caraccioli by name and depicted actual sexual videos or images of Mr. Caraccioli.

79.     The Fake Account was seen and read on or about September 14, 2014 by hundreds or anyone who received a friend request from the Fake Account. Specific names are ascertainable and can be given upon discovery.

80.     The above-described republication was not privileged because it was published by Defendants with conscious or reckless disregard as to the falsity or obscene sexual content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

81.     Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

COMPLAINT FOR PUNITIVE DAMAGES

82.     As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

83.     The Fake Account referenced above are false and defamatory and were made by DEFENDANT FACEBOOK with knowledge of their falsity or with reckless disregard for their truth pursuant to a conspiracy.  They referred to Mr. Caraccioli by name or innuendo and those who read or saw the Fake Account understood they concerned the Mr. Caraccioli.

84.     The Fake Account referenced above was libelous on its face or per se and thus, damages are presumed and exemplary.  The Fake Account clearly exposed Mr. Caraccioli to hatred, contempt, ridicule and/or obloquy because they charge Mr. Caraccioli with crimes and have the tendency to injure Mr. Caraccioli's general and professional reputation because they suggest Mr. Caraccioli is a criminal and untrustworthy.

85.     Punitive damages are awarded whenever malice, gross negligent, or conscious/reckless disregard conduct as to the falsity of the statement, is found against the defendant on the underlying claims, regardless of whether actual damages are neither found nor shown. New York Times Co. v. Sullivan, 376 U.S. 254, 262 (1964).

86.     DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr. Caraccioli's pertaining to the truth or falsity of the Fake Account because DEFENDANT FACEBOOK reviewed the obscenity of the Fake Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for republication.

87.     As a proximate result from republishing the sexual content in the Fake Account referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr. Caraccioli suffered and will suffer in the future, general and special damages including but not limited to, damages for psychological expenses, lost income and damage to her trade, profession, and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds this Court's jurisdictional minimum, but in no event less than $100,000.00.

- 14 -

87.     The aforementioned wrongful acts of Defendants were done intentionally or with a conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to exemplary and punitive damages in an amount appropriate to punish or to set an example of Defendants and each of them, and to deter such conduct in the future, which amount will be proved at trial, but in no event should be less than $1,000,000.00.

88.     The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are not furthered by providing immunity in instances where posted reposted material is clearly not meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

**THIRD CAUSE OF ACTION**

**(Invasion of Privacy Upon the Solitude or Seclusion of Mr. Caraccioli)**

(Against All Defendants)

89.     Mr. Caraccioli realleges and incorporates by reference the allegations contained in paragraphs 1 through 88 above.

90.     All Defendants violated Mr. Caraccioli's personal privacy by continuing to broadcast worldwide over its Website, sexually obscene content regarding Mr. Caraccioli that was not meant for public dissemination.

91.     The sexual content exposing Mr. Caraccioli in the Fake Account would be highly offensive to a reasonable person  because it involved showing Mr. Caraccioli's genitalia.

92.     The precise republishing of the Fake Account constituted the invasion of privacy are set forth in the aforementioned paragraphs and are incorporated herein by reference.

93.     The Fake Account was seen and read on or about September 14, 2014 by hundreds of individuals worldwide, children, or anyone who received a friend request from the Fake Account or saw the Fake "Franco Caracciolijerkingman" Account. Specific names are ascertainable and can be given upon discovery.

94.     The above-described republication was not privileged because it was published by DEFENDANT FACEBOOK with conscious or reckless disregard as to the falsity or obscene sexual

- 15 -

**COMPLAINT FOR PUNITIVE DAMAGES**

content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

95.     Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

96.     Under invasion of privacy cases involving punitive damages, the applicable standard is common-law malice—frequently expressed in terms of either reckless or wanton disregard of the Mr. Caraccioli's rights or personal ill will—focuses on the defendant's attitude toward the Mr. Caraccioli's privacy, not toward the truth or falsity of the material published. Cantrell v. Forest City Pub. Co., 419 U.S. 245, 252 (1974).

97.     DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr. Caraccioli's privacy rights because DEFENDANT FACEBOOK reviewed the obscenity of the Fake Account which conspicuously showed Mr. Caraccioli engaging in pornographic content, and determined it was good for republication and worldwide dissemination, which would include children viewing it or the possibility thereof.

98.     As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

99.     As a proximate result from republishing the sexual content in the Fake Account referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr. Caraccioli suffered and will suffer in the future, general and special damages including but not limited to, damages for psychological expenses, lost income and damage to her trade, profession, and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds this Court's jurisdictional minimum, but in no event less than $100,000.00.

100.     The aforementioned wrongful acts of Defendants were done intentionally or with a conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to

1 exemplary and punitive damages in an amount appropriate to punish or to set an example of

2 Defendants and each of them, and to deter such conduct in the future, which amount will be proved

3 at trial, but in no event should be less than $1,000,000.00.

4       101.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for

5 reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are

6 not furthered by providing immunity in instances where posted reposted material is clearly not

7 meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

8 **FOURTH CAUSE OF ACTION**

9 **(Invasion of Privacy through Public Disclosure of Private Facts)**

10 (Against All Defendants)

11       102.    A claim of invasion of privacy by public disclosure of private facts, under California

12 law, requires (1) public disclosure (2) of a private fact (3) which would be offensive and

13 objectionable to the reasonable person and (4) which is not of legitimate public interest. Carafano v.

14 Metrosplash.com Inc., 207 F. Supp. 2d 1055 (C.D. Cal. 2002).

15       103.    Mr. Caraccioli realleges and incorporates by reference the allegations contained in

16 paragraphs 1 through 101 above.

17       104.    Since Mr. Caraccioli is not a public figure, exposing his genitalia is not in the

18 public's interest.

19       105.    This sexual content would be highly offensive and objectionable to a reasonable

20 person because it involved the showing of Mr. Caraccioli's genitalia.

21       106.    The precise republishing of the Fake Account constituted the invasion of privacy are

22 set forth in the aforementioned paragraphs and are incorporated herein by reference.

23       107.    The Fake Account was seen and read on or about September 14, 2014 by hundreds of

24 individuals worldwide, children, or anyone who received a friend request from the Fake Account or

25 saw the Fake "Franco Caracciolijerkingman" Account. Specific names are ascertainable and can be

26 given upon discovery.

27       108.    The above-described republication was not privileged because it was published by

28 DEFENDANT FACEBOOK with conscious or reckless disregard as to the falsity or obscene sexual

1 content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr.

2 Caraccioli.

3   109. Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli

4 seeks punitive damages in a total amount to be established by proof at trial.

5   110. Under invasion of privacy cases, the applicable standard is common-law malice—

6 frequently expressed in terms of either reckless or wanton disregard of the Mr. Caraccioli's rights or

7 personal ill will—would focus on the defendant's attitude toward the Mr. Caraccioli's privacy, not

8 toward the truth or falsity of the material published. Cantrell v. Forest City Pub. Co., 419 U.S. 245,

9 252 (1974).

10   111. DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr.

11 Caraccioli's privacy rights because DEFENDANT FACEBOOK reviewed the obscenity of the Fake

12 Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for

13 republication.

14   112. As a proximate result of the above-described republication, Mr. Caraccioli has

15 suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to

16 be established by proof at trial.

17   113. As a proximate result from republishing the sexual content in the Fake Account

18 referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along

19 with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake

20 Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr.

21 Caraccioli suffered and will suffer in the future, general and special damages including but not

22 limited to, damages for psychological expenses, lost income and damage to her trade, profession,

23 and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds

24 this Court's jurisdictional minimum, but in no event less than $100,000.00.

25   114. The aforementioned wrongful acts of Defendants were done intentionally or with a

26 conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr.

27 Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to

28 exemplary and punitive damages in an amount appropriate to punish or to set an example of

1   Defendants and each of them, and to deter such conduct in the future, which amount will be proved

2   at trial, but in no event should be less than $1,000,000.00.

3        115.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for

4   reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are

5   not furthered by providing immunity in instances where posted reposted material is clearly not

6   meant for publication. <u>Batzel v. Smith</u>, 333 F.3d 1018, 1034 (9th Cir. 2003).

7   **FIFTH CAUSE OF ACTION**

8   **(Invasion of Privacy by Portraying Mr. Caraccioli in False Light)**

9   (All Defendants)

10        116.    The Supreme Court of The United States has said that recovery for false light must

11   meet the same constitutional standards applied in defamation action. <u>Time, Inc. v. Hill</u>, 385 U.S.

12   374, 388-91 (1967).

13        117.    Mr. Caraccioli realleges and incorporates by reference the allegations contained in

14   paragraphs 55 through 74 above.

15        118.    This sexual content would be highly offensive to a reasonable person  because it

16   involved showing Mr. Caraccioli's genitalia.

17        119.    Mr. Caraccioli is informed and believes, and thereupon alleges, that on or about

18   September, Defendants, without Mr. Caraccioli's consent, conspired to place Mr. Caraccioli in a

19   false light, and did in fact, place Mr. Caraccioli in a false light by republishing a Fake Account via

20   Defendant's Website, which wrongly and falsely depicted Mr. Caraccioli as being a person who

21   engages in unethical, illegal and improper behavior.

22        120.    The precise republishing of the Fake Account constituted the invasion of privacy are

23   set forth in the aforementioned paragraphs and are incorporated herein by reference.

24        121.    The republishing made by the Defendants placed Mr. Caraccioli in a false light in the

25   public eye by conveying the message that Mr. Caraccioli was engaged in unethical, illegal, and

26   improper behavior including, but not limited to, fraud or deceit.

27        122.    The DEFENDANT FACEBOOKS' republishing was offensive and objectionable to

28   Mr. Caraccioli, and would be to a reasonable person of ordinary sensibilities.  The republishing

1   injured Mr. Caraccioli's professional reputation and made Mr. Caraccioli the object of scorn and

2   ridicule to Mr. Caraccioli's current employer, thus causing extreme emotional distress and injury to

3   Mr. Caraccioli.

4        123.   The Fake Account was seen and read on or about September 14, 2014 by hundreds or

5   anyone who received a friend request from the Fake Account. Specific names are ascertainable and

6   can be given upon discovery.

7        124.   The above-described republication was not privileged because it was published by

8   Defendants with conscious or reckless disregard as to the falsity or obscene sexual content,

9   establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

10       125.   Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli

11   seeks punitive damages in a total amount to be established by proof at trial.

12       126.   Under invasion of privacy cases, the applicable standard is common-law malice—

13   frequently expressed in terms of either reckless or wanton disregard of the Mr. Caraccioli's rights or

14   personal ill will—would focus on the defendant's attitude toward the Mr. Caraccioli's privacy, not

15   toward the truth or falsity of the material published. Cantrell v. Forest City Pub. Co., 419 U.S. 245,

16   252 (1974).

17       127.   DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr.

18   Caraccioli's privacy rights because DEFENDANT FACEBOOK reviewed the obscenity of the Fake

19   Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for

20   republication.

21       128.   Mr. Caraccioli is informed and believes, and on that basis alleges, that the

22   aforementioned statements made by Defendants were made with actual malice and with knowledge

23   that each such statement was false and would place Mr. Caraccioli in a false light, or were published

24   with reckless disregard for the truth or falsity of such statements pursuant to a conspiracy among

25   Defendants, each and every one of them.

26       129.   As a proximate result of the above-described republication, Mr. Caraccioli has

27   suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to

28   be established by proof at trial.

COMPLAINT FOR PUNITIVE DAMAGES

1    130.    As a proximate result from republishing the sexual content in the Fake Account

2    referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along

3    with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake

4    Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr.

5    Caraccioli suffered and will suffer in the future, general and special damages including but not

6    limited to, damages for psychological expenses, lost income and damage to her trade, profession,

7    and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds

8    this Court's jurisdictional minimum, but in no event less than $100,000.00.

9    131.    The aforementioned wrongful acts of Defendants were done intentionally or with a

10   conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr.

11   Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to

12   exemplary and punitive damages in an amount appropriate to punish or to set an example of

13   Defendants and each of them, and to deter such conduct in the future, which amount will be proved

14   at trial, but in no event should be less than $1,000,000.00.

15   132.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for

16   reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are

17   not furthered by providing immunity in instances where posted reposted material is clearly not

18   meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

19                                    **SIXTH CAUSE OF ACTION**

20                          **(Intentional Infliction of Emotional Distress)**

21                                    (Against All Defendants)

22   133.    To prevail on such a claim, a Mr. Caraccioli must generally prove that (1) a defendant

23   engaged in "extreme and outrageous conduct," (2) the defendant intentionally or recklessly inflicted

24   emotional distress on the Mr. Caraccioli, and (3) defendant's actions actually resulted in severe

25   emotional distress. Any claim of outrage must be predicated on behavior so outrageous in character,

26   and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

27   atrocious, and utterly intolerable in a civilized society.

28   ///

134. Mr. Caraccioli realleges and incorporates by reference the allegations contained in paragraphs 1 through 132 above.

135. Based on the above alleged acts, DEFENDANT FACEBOOKS' misconduct was extreme, outrageous and done with the intent to cause emotional distress or with reckless disregard of the probability of causing Mr. Caraccioli emotional distress.

136. Republishing pornographic content in violation of Defendant's own "Terms of Service," while claiming that the pornographic content is not obscene in nature is beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

137. Defendants, and each of them, as aforesaid, were intentional, extreme, and outrageous, causing Mr. Caraccioli emotional distress by republishing the sexual content in violation of Defendant's own "Terms of Service" and more importantly, in violation of Legislative intent and policy pursuant to The Communications Decency Act 47 U.S.C.A. § 230.

138. The Fake Account was seen and read on or about September 14, 2014 by hundreds or anyone who received a friend request from the Fake Account. Specific names are ascertainable and can be given upon discovery.

139. The above-described republication was not privileged because it was published by Defendants with conscious or reckless disregard as to the falsity or obscene sexual content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

140. Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

141. Punitive damages in emotional distress cases are awarded when "the defendant's conduct involves reckless or callous indifference to the federally protected rights of others, or motivated by evil motive or intent. *See* Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) and Mockler v. Multnomah County, 141 F.3d 1177 (9th Cir. 1998).

142. DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr. Caraccioli's privacy rights because DEFENDANT FACEBOOK reviewed the obscenity of the Fake

1 Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for

2 republication.

3      143.   As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr.

4 Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has been

5 subjected to severe emotional distress and will continue to suffer severe and permanent humiliation,

6 mental pain and anguish, and will continue to live in a constant state of emotional tension and

7 distress because of the amount of people who saw the obscene content in the Fake Account sexually

8 exposing Mr. Caraccioli, or kept a copy of the images or video.

9      144.   As a direct and proximate result of the DEFENDANT FACEBOOKS', and each of

10 their actions, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli

11 has suffered severe and serious injury to her person, all to Mr. Caraccioli's damage in a sum within

12 the jurisdiction of this Court and to be shown according to proof.

13      145.   As a proximate result of the above-described republication, Mr. Caraccioli has

14 suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to

15 be established by proof at trial.

16      146.   As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr.

17 Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered and

18 continues to suffer substantial losses in income, earnings, and benefits and has been damaged in her

19 capacity to earn her salary, and has lost and will continue to lose employment benefits because of the

20 amount of people who saw the obscene content in the Fake Account sexually exposing Mr.

21 Caraccioli, or kept a copy of the images or video.

22      147.   In committing the aforesaid wrongful acts, DEFENDANT FACEBOOK acted with

23 malice, oppression, and disregard of Mr. Caraccioli's rights and interests, thereby entitling Mr.

24 Caraccioli to an award of punitive and exemplary damages.

25      148.   The Fake Account was seen and read on or about September 14, 2014 by hundreds or

26 anyone who received a friend request from the Fake Account. Specific names are ascertainable and

27 can be given upon discovery.

28

COMPLAINT FOR PUNITIVE DAMAGES

149.    The above-described republication was not privileged because it was published by Defendants with conscious or reckless disregard as to the falsity or obscene sexual content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

150.    Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

151.    As a direct and proximate result of DEFENDANT FACEBOOKS' conduct, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has been subjected to severe emotional distress and will continue to suffer severe and permanent humiliation, mental pain and anguish, and will continue to live in a constant state of emotional tension and distress because of the amount of people who saw the obscene content in the Fake Account sexually exposing Mr. Caraccioli, or kept a copy of the images or video.

152.    As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered and continues to suffer substantial losses in income, earnings, and benefits and has been damaged in her capacity to earn her salary, and has lost and will continue to lose employment benefits.

153.    As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

154.    As a direct and proximate result of the Defendants, and each of their actions, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered severe emotional distress and serious injury to her person because of the amount of people who saw the Fake Account's sexual content and/or made a copy of the sexual images or video, all to Mr. Caraccioli's damage in a sum within the jurisdiction of this Court and to be shown according to proof, but in no event less than $100,000.00.

87.    The aforementioned wrongful acts of Defendants were done intentionally or with a conscious disregard of Mr. Caraccioli's rights, interests, psychological well-being, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to exemplary and punitive damages in an amount appropriate to punish or to

COMPLAINT FOR PUNITIVE DAMAGES

1    set an example of Defendants and each of them, and to deter such conduct in the future, which

2    amount will be proved at trial, but in no event should be less than $1,000,000.00.

3          155.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for

4    reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are

5    not furthered by providing immunity in instances where posted reposted material is clearly not

6    meant for publication. <u>Batzel v. Smith</u>, 333 F.3d 1018, 1034 (9th Cir. 2003).

7                              **SEVENTH CAUSE OF ACTION**

8                    **(Negligent Infliction of Emotional Distress)**

9                           **(Against All Defendants)**

10          156.    Mr. Caraccioli realleges and incorporates by reference the allegations contained in

11    paragraphs 1 through 155 above.

12          157.    Facebook owed a duty to Mr. Caraccioli based on the "Terms of Service" agreed and

13    DEFENDANT FACEBOOK breached this duty by republishing the Fake Account

14          158.    Defendants, and each of them, as aforesaid, were intentional, extreme, and

15    outrageous, causing Mr. Caraccioli emotional distress because DEFENDANT FACEBOOK

16    reviewed and republished the sexual content in violation of Defendant's own "Terms of Service"

17    and more importantly, in violation of Legislative intent and policy pursuant to The Communications

18    Decency Act 47 U.S.C.A. § 230.

19          159.    Punitive damages in emotional distress cases are awarded when "the defendant's

20    conduct involves reckless or callous indifference to the federally protected rights of others, or

21    motivated by evil motive or intent. <u>See</u> <u>Smith v. Wade</u>, 461 U.S. 30, 103 S.Ct. 1625, 1640, 75

22    L.Ed.2d 632 (1983); <u>and</u> <u>Mockler v. Multnomah County</u>, 141 F.3d 1177 (9th Cir. 1998).

23          160.    DEFENDANT FACEBOOK acted with malice or reckless disregard towards Mr.

24    Caraccioli's privacy rights because DEFENDANT FACEBOOK reviewed the obscenity of the Fake

25    Account which conspicuously showed Mr. Caraccioli naked, and determined it was good for

26    republication.

27          161.    As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr.

28    Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has been

1 | subjected to severe emotional distress and will continue to suffer severe and permanent humiliation,

2 | mental pain and anguish, and will continue to live in a constant state of emotional tension and

3 | distress because of the amount of people who saw the obscene content in the Fake Account sexually

4 | exposing Mr. Caraccioli, or kept a copy of the images or video.

5 |     162.   As a direct and proximate result of the Defendants, and each of their actions, Mr.

6 | Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered

7 | severe and serious injury to her person, all to Mr. Caraccioli's damage in a sum within the

8 | jurisdiction of this Court and to be shown according to proof.

9 |     163.   As a proximate result of the above-described republication, Mr. Caraccioli has

10 | suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to

11 | be established by proof at trial.

12 |     164.   As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr.

13 | Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered and

14 | continues to suffer substantial losses in income, earnings, and benefits and has been damaged in her

15 | capacity to earn her salary, and has lost and will continue to lose employment benefits because of the

16 | amount of people who saw the obscene content in the Fake Account sexually exposing Mr.

17 | Caraccioli, or kept a copy of the images or video.

18 |     165.   In committing the aforesaid wrongful acts, Defendants acted with malice, oppression,

19 | and disregard of Mr. Caraccioli's rights and interests, thereby entitling Mr. Caraccioli to an award of

20 | punitive and exemplary damages.

21 |     166.   The Fake Account was seen and read on or about September 14, 2014 by hundreds or

22 | anyone who received a friend request from the Fake Account. Specific names are ascertainable and

23 | can be given upon discovery.

24 |     167.   The above-described republication was not privileged because it was published by

25 | Defendants with conscious or reckless disregard as to the falsity or obscene sexual content,

26 | establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

27 | ///

28 |

COMPLAINT FOR PUNITIVE DAMAGES

168. Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

169. As a direct and proximate result of DEFENDANT FACEBOOKS' conduct, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has been subjected to severe emotional distress and will continue to suffer severe and permanent humiliation, mental pain and anguish, and will continue to live in a constant state of emotional tension and distress because of the amount of people who saw the obscene content in the Fake Account sexually exposing Mr. Caraccioli, or kept a copy of the images or video.

170. As a direct and proximate result of the DEFENDANT FACEBOOKS' conduct, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered and continues to suffer substantial losses in income, earnings, and benefits and has been damaged in her capacity to earn her salary, and has lost and will continue to lose employment benefits.

171. As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

172. As a direct and proximate result of the Defendants, and each of their actions, Mr. Caraccioli is informed and believes, and based thereon alleges, that Mr. Caraccioli has suffered severe emotional distress and serious injury to her person because of the amount of people who saw the Fake Account's sexual content and/or made a copy of the sexual images or video, all to Mr. Caraccioli's damage in a sum within the jurisdiction of this Court and to be shown according to proof, but in no event less than $100,000.00.

87. The aforementioned wrongful acts of Defendants were done intentionally or with a conscious disregard of Mr. Caraccioli's rights, interests, psychological well-being, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to exemplary and punitive damages in an amount appropriate to punish or to set an example of Defendants and each of them, and to deter such conduct in the future, which amount will be proved at trial, but in no event should be less than $1,000,000.00.

///

COMPLAINT FOR PUNITIVE DAMAGES

173.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are not furthered by providing immunity in instances where posted reposted material is clearly not meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

## EIGHTH CAUSE OF ACTION

### (Breach of Contract Pursuant to DEFENDANT FACEBOOK'S "Terms of Service Agreement"

### (Against All Defendants)

174.    Mr. Caraccioli realleges and incorporates by reference the allegations contained in paragraphs 1 through 173 above.

175.    Pursuant to section 3 regarding safety and section 5 regarding the protection of user's rights located in DEFENDANT FACEBOOK's "Terms of Service Agreement," DEFENDANT FACEBOOK's admission that Franco Caracciolijerkingman is following Facebook Community Standards is a *per se* violation of DEFENDANT FACEBOOK's own "Terms of Service" and constitutes breach of Defendant's contractual duties because the "Terms of Service" section 3 and 5 [see Exhibit 2] states: "You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence" and "We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies," respectively.

176.    DEFENDANT FACEBOOK breached their contractual duty under the "Terms of Service" because DEFENDANT FACEBOOK republished sexually obscene and highly offensive material about Mr. Caraccioli, material that DEFENDANT FACEBOOK was under a duty to remove.

177.    The Fake Account was seen and read on or about September 14, 2014 by hundreds or anyone who received a friend request from the Fake Account. Specific names are ascertainable and can be given upon discovery.

178.    The above-described republication was not privileged because it was republished by DEFENDANT FACEBOOK with conscious or reckless disregard as to the falsity or obscene sexual

1  content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr.

2  Caraccioli.

3       179.   Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli

4  seeks punitive damages in a total amount to be established by proof at trial.

5       180.   Punitive damages are generally not recoverable for breach of contract unless the

6  conduct constituting the breach is also a tort. *See* In re Late Fee and Over-Limit Fee Litig., 741 F.3d

7  1022, 1026 (9th Cir. 2014) cert. denied sub nom: Pinon v. Bank of Am., NA, 134 S. Ct. 2878

8  (2014); *and* Restatement (Second) of Contracts § 355.

9       181.   Because the underlying claim that gives rise to the breach involves several tort

10 actions per se, punitive damages, should be found reasonable by this court.

11      182.   As a proximate result of the above-described republication, Mr. Caraccioli has

12 suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to

13 be established by proof at trial.

14      183.   As a proximate result from republishing the sexual content in the Fake Account

15 referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along

16 with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake

17 Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr.

18 Caraccioli suffered and will suffer in the future, general and special damages including but not

19 limited to, damages for psychological expenses, lost income and damage to her trade, profession,

20 and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds

21 this Court's jurisdictional minimum, but in no event less than $100,000.00.

22      184.   The aforementioned wrongful acts of Defendants were done intentionally or with a

23 conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr.

24 Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to

25 exemplary and punitive damages in an amount appropriate to punish or to set an example of

26 Defendants and each of them, and to deter such conduct in the future, which amount will be proved

27 at trial, but in no event should be less than $1,000,000.00.

28 ///

185. The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are not furthered by providing immunity in instances where posted reposted material is clearly not meant for publication. <u>Batzel v. Smith</u>, 333 F.3d 1018, 1034 (9th Cir. 2003).

## NINTH CAUSE OF ACTION

### (Negligent Hiring, Supervision, or Retention)

### (Against All Defendants)

186. Mr. Caraccioli re-alleges and incorporates herein by this reference the allegations in paragraphs 1 through 185 inclusive, as though set forth herein.

187. At all times mentioned in this complaint, Mr. Caraccioli is informed and believes, and based thereon alleges, that DEFENDANT FACEBOOK, Inc., negligently and carelessly trained and retained its employees including, but not limited to, Does 1 through 10.

188. Mr. Caraccioli is informed and believes, and based thereon alleges, that DEFENDANT FACEBOOK, Inc., breached their duty to exercise reasonable care and acted with reckless disregard in the training and retention by failing to give them adequate training to detect, but not limited to, unwanted sexual publications or otherwise unlawful content pursuant to The Communications Decency Act 47 U.S.C.A. § 230.

189. DEFENDANT FACEBOOK negligently failed to investigate the background of DEFENDANT FACEBOOK employees including, but not limited to, Does 1 through 10 in order to prevent republication of sexual or otherwise unlawful content in the DEFENDANT FACEBOOK's Website.

190. The Fake Account was seen and read on or about September 14, 2014 by hundreds or anyone who received a friend request from the Fake Account. Specific names are ascertainable and can be given upon discovery.

191. The above-described republication was not privileged because it was published by Defendants with conscious or reckless disregard as to the falsity or obscene sexual content, establishing malice, hatred and ill will toward Mr. Caraccioli or the desire to injure Mr. Caraccioli.

///

- 30 -
COMPLAINT FOR PUNITIVE DAMAGES

192.    Because of DEFENDANT FACEBOOKS' malice in republishing, Mr. Caraccioli seeks punitive damages in a total amount to be established by proof at trial.

193.    Punitive Damages are awarded when there is a showing of malice or reckless disregard in cases involving the negligent hiring, supervision, and retention. Phiffer v. Proud Parrot Motor Hotel, Inc., 648 F.2d 548, 553 (9th Cir. 1980).

194.    Because the underlying claim giving rise to the negligent supervision issue, the court should reasonably award punitive damages to Mr. Caraccioli.

195.    As a proximate result of the above-described republication, Mr. Caraccioli has suffered loss of his reputation, shame, mortification, and injury to his feelings, in a total amount to be established by proof at trial.

196.    As a proximate result from republishing the sexual content in the Fake Account referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr. Caraccioli suffered and will suffer in the future, general and special damages including but not limited to, damages for psychological expenses, lost income and damage to her trade, profession, and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds this Court's jurisdictional minimum, but in no event less than $100,000.00.

197.    The aforementioned wrongful acts of Defendants were done intentionally or with a conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr. Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to exemplary and punitive damages in an amount appropriate to punish or to set an example of Defendants and each of them, and to deter such conduct in the future, which amount will be proved at trial, but in no event should be less than $1,000,000.00.

198.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are not furthered by providing immunity in instances where posted reposted material is clearly not meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

COMPLAINT FOR PUNITIVE DAMAGES

**TENTH CAUSE OF ACTION**

**Claim for Remedies for Violations of the California Unfair Business Practices Code §§ 17001-**

**17210, *et seq.***

(Against all Defendants)

199.     Mr. Caraccioli re-alleges and incorporates by reference the foregoing allegations in paragraphs 1 through 198, inclusive, as though set forth herein.

200.     Defendants, and each of them, are "persons" as defined under the Business and Professions Code.

201.     Mr. Caraccioli is informed and believes and based thereon alleges that Defendants committed the unfair business practices, as defined by Cal. Bus. & Prof. Code § 17001-17210, *et seq.*, by engaging in deceptive conduct that violated Mr. Caraccioli's rights and the CDA's legislative intent with reckless or gross disregard towards the rights of others, allegations which are incorporated herein by reference and which allegations include, but are not limited to:

    a)   Defamation;

    b)   Libel;

    c)   Invasion of Privacy Upon the Solitude or Seclusion;

    d)   Invasion of Privacy in False Light;

    e)   Invasion of Privacy by Public Disclosure of Private Facts;

    f)   Intentional Infliction of Emotional Distress;

    g)   Negligent Infliction of Emotional Distress;

    h)   Breach of Contract; AND

    i)   Negligent Supervision and Retention.

202.     DEFENDANT FACEBOOKS' conduct, as alleged above, constitutes unlawful, unfair, andFraudulent, or deceptive activity prohibited by Business and Professions Code §§ 17001-17210., *et seq.*

203.     Mr. Caraccioli relied on DEFENDANT FACEBOOK'S "Terms of Service" to his reputational detriment because Mr. Caraccioli relied on DEFENDANT FACEBOOK to block sexually obscene content and/or not recklessly disregard DEFENDANT

1    FACEBOOK'S own "Terms of Service" which lead to DEFENDANT FACEBOOK'S

2    injury causing republication of the Fake Account.

3    204.    As a proximate cause from such reckless conduct by DEFENDANT FACEBOOK,

4    Mr. Caraccioli has suffered injury per se and therefore seeks punitive damages as afforded under, but

5    not limited to, §§ 17001-17210, *et seq* and other damages this court deems reasonable. Guglielmino

6    v. McKee Foods Corp., 506 F.3d 696, 700 (9th Cir. 2007).

7    205.    As a result of their improper deceptive acts, Mr. Caraccioli also seeks punitive

8    damages because DEFENDANT FACEBOOK reaped unfair benefits or illegal profits at the expense

9    of Mr. Caraccioli in the form of advertising sales and the increase in traffic flow from online users

10   accessing the Fake Account in DEFENDANT FACEBOOK'S Website.

11   206.    As a proximate result from republishing the sexual content in the Fake Account

12   referenced above, Mr. Caraccioli has suffered, and will continue to suffer, loss of reputation along

13   with shame, mortification, and hurt feelings because of the quantity of people who saw the Fake

14   Account and personally kept and/or copied the images or videos in the Account. Therefore, Mr.

15   Caraccioli suffered and will suffer in the future, general and special damages including but not

16   limited to, damages for psychological expenses, lost income and damage to her trade, profession,

17   and occupation in a sum not yet capable of ascertainment other than the fact that the sum exceeds

18   this Court's jurisdictional minimum, but in no event less than $100,000.00.

19   207.    The aforementioned wrongful acts of Defendants were done intentionally or with a

20   conscious disregard of Mr. Caraccioli's rights, and with the intent to vex, injure or annoy Mr.

21   Caraccioli such as to constitute oppression, fraud, or malice, thus entitling Mr. Caraccioli to

22   exemplary and punitive damages in an amount appropriate to punish or to set an example of

23   Defendants and each of them, and to deter such conduct in the future, which amount will be proved

24   at trial, but in no event should be less than $1,000,000.00.

25   208.    The Communications Decency Act 47 U.S.C.A. § 230 does not grant immunity for

26   reckless conduct in disregard for the truth because the congressional objectives in passing § 230 are

27   not furthered by providing immunity in instances where posted reposted material is clearly not

28   meant for publication. Batzel v. Smith, 333 F.3d 1018, 1034 (9th Cir. 2003).

**DEMAND FOR TRIAL BY JURY**

209.   Mr. Caraccioli hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Caraccioli prays for judgment against defendants as follows:

1. For compensatory damages, including loss of wages, promotional opportunities, benefits and other opportunities of employment, according to proof;

2. For past, present, and future mental and emotional distress damages, and damages for injury to reputation;

3. For an award of interest, including prejudgment interest, at the legal rate;

4. For an award of prevailing party attorneys' fees, if counsel is appointed by the court or obtained.

6. For punitive and exemplary damages in an amount sufficient to punish and deter DEFENDANT FACEBOOKS' outrageous conduct;

7. For costs of suit incurred herein;

8. For such other and further relief as the court deems just and proper.

Dated:

By: _____
FRANCO CARACCIOLI

- 34 -

COMPLAINT FOR PUNITIVE DAMAGES

Scanned by CamScanner

 You reported Franco Caracciolijerkingman for pretending to be you.

---

## Status

This profile wasn't removed
Submitted on 2 hours ago

Thanks for letting us know that Franco Caracciolijerkingman might be impersonating you. We reviewed the account and determined that Franco Caracciolijerkingman is a person who's using Facebook in a way that follows the Facebook Community Standards.

Facebook is a place where people connect with their real identities, and we take these kinds of issues seriously. If you think we made a mistake, let us know.

We understand that Franco Caracciolijerkingman may be upsetting you, so we've created tools for you to make sure you don't have to see Franco Caracciolijerkingman on Facebook. You can:

1. Unfollow Franco Caracciolijerkingman
2. Unfriend Franco Caracciolijerkingman

Facebook "Terms of Service" as found in DEFENDANT FACEBOOK'S Website:

https://www.facebook.com/legal/terms

"This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls.  Please note that Section 16 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: January 30, 2015

**Statement of Rights and Responsibilities**

This Statement of Rights and Responsibilities ("Statement," "Terms," or "SRR") derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook, as well as Facebook brands, products and services, which we call the "Facebook Services" or "Services". By using or accessing the Facebook Services, you agree to this Statement, as updated from time to time in accordance with Section 13 below. Additionally, you will find resources at the end of this document that help you understand how Facebook works.

Because Facebook provides a wide range of Services, we may ask you to review and accept supplemental terms that apply to your interaction with a specific app, product, or service. To the extent those supplemental terms conflict with this SRR, the supplemental terms associated with the app, product, or service govern with respect to your use of such app, product or service to the extent of the conflict.

1. **Privacy**

   Your privacy is very important to us. We designed our Data Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Policy, and to use it to help you make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:

   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).

3. When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you. We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information. (To learn more about Platform, including how you can control what information other people may share with applications, read our Data Policy and Platform Page.)

4. When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).

5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use your feedback or suggestions without any obligation to compensate you for them (just as you have no obligation to offer them).

## 3. Safety

We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to keep Facebook safe, which includes the following commitments by you:

1. You will not post unauthorized commercial communications (such as spam) on Facebook.

2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our prior permission.

3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.

4. You will not upload viruses or other malicious code.

5. You will not solicit login information or access an account belonging to someone else.

6. You will not bully, intimidate, or harass any user.

7. You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.

8. You will not develop or operate a third-party application containing alcohol-related, dating or other mature content (including advertisements) without appropriate age-based restrictions.

9. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.

10. You will not do anything that could disable, overburden, or impair the proper working or appearance of Facebook, such as a denial of service attack or interference with page rendering or other Facebook functionality.

11. You will not facilitate or encourage any violations of this Statement or our policies.

## 4. Registration and Account Security

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
2. You will not create more than one personal account.
3. If we disable your account, you will not create another one without our permission.
4. You will not use your personal timeline primarily for your own commercial gain, and will use a Facebook Page for such purposes.
5. You will not use Facebook if you are under 13.
6. You will not use Facebook if you are a convicted sex offender.
7. You will keep your contact information accurate and up-to-date.
8. You will not share your password (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
9. You will not transfer your account (including any Page or application you administer) to anyone without first getting our written permission.
10. If you select a username or similar identifier for your account or Page, we reserve the right to remove or reclaim it if we believe it is appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

5. **Protecting Other People's Rights**

We respect other people's rights, and expect you to do the same.

1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2. We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.
3. We provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
6. You will not use our copyrights or Trademarks or any confusingly similar marks, except as expressly permitted by our Brand Usage Guidelines or with our prior written permission.
7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.
8. You will not post anyone's identification documents or sensitive financial information on Facebook.
9. You will not tag users or send email invitations to non-users without their consent. Facebook offers social reporting tools to enable users to provide feedback about tagging.

6. **Mobile and Other Devices**

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging and data charges, will still apply.

2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.
3. You provide consent and all rights necessary to enable users to sync (including through an application) their devices with any information that is visible to them on Facebook.

## 7. Payments

If you make a payment on Facebook, you agree to our Payments Terms unless it is stated that other terms apply.

## 8. Special Provisions Applicable to Developers/Operators of Applications and Websites

If you are a developer or operator of a Platform application or website or if you use Social Plugins, you must comply with the Facebook Platform Policy.

## 9. About Advertisements and Other Commercial Content Served or Enhanced by Facebook

Our goal is to deliver advertising and other commercial or sponsored content that is valuable to our users and advertisers. In order to help us do that, you agree to the following:

1. You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you. If you have selected a specific audience for your content or information, we will respect your choice when we use it.
2. We do not give your content or information to advertisers without your consent.
3. You understand that we may not always identify paid services and communications as such.

## 10. Special Provisions Applicable to Advertisers

If you use our self-service advertising creation interfaces for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, the "Self-Serve Ad Interfaces"), you agree to our Self-Serve Ad Terms. In addition, your advertising or other commercial or sponsored activity or content placed on Facebook or our publisher network will comply with our Advertising Policies.

## 11. Special Provisions Applicable to Pages

If you create or administer a Page on Facebook, or run a promotion or an offer from your Page, you agree to our Pages Terms.

## 12. Special Provisions Applicable to Software

1. If you download or use our software, such as a stand-alone software product, an app, or a browser plugin, you agree that from time to time, the software may download and install upgrades, updates and additional features from us in order to improve, enhance, and further develop the software.
2. You will not modify, create derivative works of, decompile, or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license, or we give you express written permission.

## 13. Amendments

1. We'll notify you before we make changes to these terms and give you the opportunity to review and comment on the revised terms before continuing to use our Services.
2. If we make changes to policies, guidelines or other terms referenced in or incorporated by this Statement, we may provide notice on the Site Governance Page.
3. Your continued use of the Facebook Services, following notice of the changes to our terms, policies or guidelines, constitutes your acceptance of our amended terms, policies or guidelines.

## 14. Termination

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 9.3, and 14-18.

## 15. Disputes

1. You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.
2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim. Although we provide rules for user conduct, we do not control or direct users' actions on Facebook and are not responsible for the content or information users transmit or share on Facebook. We are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook. We are not responsible for the conduct, whether online or offline, of any user of Facebook.

3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## 16. Special Provisions Applicable to Users Outside the United States

We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users and non-users who interact with Facebook outside the United States:

1. You consent to having your personal data transferred to and processed in the United States.
2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website. You will not use Facebook if you are prohibited from receiving products, services, or software originating from the United States.
3. Certain specific terms that apply only for German users are available here.

## 17. Definitions

1. By "Facebook" or" Facebook Services" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the Like button, the Share button and other similar offerings; and (d) other media, brands, products, services, software (such as a toolbar), devices, or networks now existing or later developed. Facebook reserves the right to designate, in its sole discretion, that certain of our brands, products, or services are governed by separate terms and not this SRR.
2. By "Platform" we mean a set of APIs and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
3. By "information" we mean facts and other information about you, including actions taken by users and non-users who interact with Facebook.
4. By "content" we mean anything you or other users post, provide or share using Facebook Services.
5. By "data" or "user data" or "user's data" we mean any data, including a user's content or information that you or third parties can retrieve from Facebook or provide to Facebook through Platform.
6. By "post" we mean post on Facebook or otherwise make available by using Facebook.
7. By "use" we mean use, run, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
8. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us. If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.
9. By "Trademarks" we mean the list of trademarks provided here.

## 18. Other

1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc. Otherwise, this Statement is an agreement between you and Facebook Ireland Limited. References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.
2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.
3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.
4. If we fail to enforce any of this Statement, it will not be considered a waiver.
5. Any amendment to or waiver of this Statement must be made in writing and signed by us.
6. You will not transfer any of your rights or obligations under this Statement to anyone else without our consent.
7. All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
8. Nothing in this Statement shall prevent us from complying with the law.
9. This Statement does not confer any third party beneficiary rights.
10. We reserve all rights not expressly granted to you.

11. You will comply with all applicable laws when using or accessing Facebook.

**By using or accessing Facebook Services, you agree that we can collect and use such content and information in accordance with the Data Policy as amended from time to time. You may also want to review the following documents, which provide additional information about your use of Facebook:**

- Payment Terms: These additional terms apply to all payments made on or through Facebook, unless it is stated that other terms apply.
- Platform Page: This page helps you better understand what happens when you add a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Policies: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Self-Serve Ad Terms: These terms apply when you use the Self-Serve Ad Interfaces to create, submit, or deliver any advertising or other commercial or sponsored activity or content.
- Promotions Guidelines: These guidelines outline the policies that apply if you offer contests, sweepstakes, and other types of promotions on Facebook.
- Facebook Brand Resources: These guidelines outline the policies that apply to use of Facebook trademarks, logos and screenshots.
- How to Report Claims of Intellectual Property Infringement
- Pages Terms: These guidelines apply to your use of Facebook Pages.
- Community Standards: These guidelines outline our expectations regarding the content you post to Facebook and your activity on Facebook.

To access the Statement of Rights and Responsibilities in several different languages, change the language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version."

- End of Content